Michael Garth Moore (023742)
9040 North Placita Verde
Tucson, Arizona 85704
Telephone: 888-318-0075
mike@mgmoorelaw.com

Joseph P. St. Louis (011728)
Nesci & St. Louis, P.L.L.C.
216 N. Main Avenue
Tucson, Arizona 85701
Telephone: 520-622-1222
joestlouis@.azdefense.com

Trial Counsel for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Greg Ohlson<br>19424 North 78th Lane<br>Glendale, Arizona 85308 | :<br>:<br>: |
| Plaintiff | : |
| -vs- | : |
| Beth Brady-Morris<br>Arizona Department of Public Safety<br>Scientific Analysis Bureau,<br>2222 West Encanto Boulevard<br>Phoenix, Arizona 85009 | :<br>:<br>:<br>: |
| and | : |
| Joseph Tripoli<br>Arizona Department of Public Safety<br>Scientific Analysis Bureau<br>2222 West Encanto Boulevard<br>Phoenix, Arizona 85009 | :<br>:<br>:<br>: Civil Action No. |
| and | : Jury Demand Endorsed Hereon |
| Timothy Chung | : |

Arizona Department of Public Safety
2222 West Encanto Boulevard                         :
Phoenix, Arizona 85009
                                                    :
        and
                                                    :
Vincent Figarelli
Arizona Department of Public Safety
Scientific Analysis Bureau                          :
2222 West Encanto Boulevard
Phoenix, Arizona 85009,                             :

        Defendants.                                 :

## COMPLAINT

### I. INTRODUCTION, PARTIES, JURISDICTION

1.  At all times pertinent hereto, until his constructive discharge, Plaintiff was employed as a Criminalist by the Arizona Department of Public Safety, Scientific Analysis Bureau, Toxicology Section;

2.  At all times pertinent hereto, Defendant Joe Tripoli was a supervisor over Plaintiff. He is sued in his individual capacity;

3.  At all times pertinent hereto, Defendant Beth Brady-Morris held the position of Supervising Forensic Scientist/Crime Laboratory Manager;

4.  At all times pertinent hereto, Defendant Timothy Chung was Assistant Director, Technical Services Division;

5.  At all times pertinent hereto, Defendant Vincent Figarelli was Superintendent, Scientific Analysis Bureau;

6.  These Defendants are sued in their individual capacities. Defendants' actions, as alleged below, were taken maliciously, and in reckless disregard of Plaintiff's

rights under the Constitution of the United States;

7. The Court has jurisdiction of this case under federal question jurisdiction, §28 U.S.C. §1331;

8. Venue is proper in this Court pursuant to 28 U.S.C. §1391;

9. The claims asserted by Plaintiff are brought to vindicate rights guaranteed Plaintiff under 42 U.S.C. §1983;

## II.   FACTS

10. Plaintiff realleges Paragraphs 1 through 9 as if fully set forth herein;

11. From the date of hire, in the year 2004, Plaintiff worked in the capacity of Forensic Scientist in the Toxicology Department in the Scientific Analysis Bureau [hereafter, "SAB"];

12. In the capacity, he was, in 2014, responsible for directing the validation of the SAB blood alcohol systems used by SAB. During the validation process multiple issues with the system became apparent;

13. Because his work involved testing blood samples obtained in DUI criminal cases, Plaintiff was occasionally subpoenaed by either prosecution or defense counsel to give evidence regarding the testing process. He was also called upon to give interviews to prosecutors and defense lawyers in advance of court testimony;

14. In 2015, Plaintiff's work on individual case testing shifted to analysis of blood alcohol levels;

15. In SAB, up to ninety (90) duplicate blood samples from up to forty-five (45) different individuals are tested in a single "batch," along with calibrators, controls, and a

"mixed standard" containing substances that are chemically similar to ethanol. The documentation resulting from the testing includes printed results, called "chromatograms" for every sample in the batch. SAB practice at the time was for the scientist doing the analysis to work with hardcopies of the batch, to check the individual sample results, to then segregate the individual results from the calibrators and controls, and, after concluding a review of the analysis, pass on the hardcopies to another scientist for a technical review. The results would be subject to a clerical, or administrative, review. The practice was to disseminate the individual chromatograms to individual case files in advance of the technical review;

16. AZDPS practice was to deny release of the entire batch results when sought through the discovery process by any attorney representing a defendant. Plaintiff learned that the agency would make the batch documentation available to a defense attorney only through the attorney's review in the SAB offices, without the production of copies to the attorney. Plaintiff was informed that, because of the manner in which the paper hardcopy system was set up, it was too burdensome on the department to release the entire batch run upon demand;

17. As a consequence of the blood alcohol validation work done, and because Plaintiff was informed that the department was contemplating building out its website so that complete batch results could be released, Plaintiff began to explore the possibility of efficiently accessing the entire batch. Plaintiff also was engaged in one instance in which he was tasked with gathering the disseminated hardcopies for review, and found it required up to two and one-half (2 ½) hours of time to accomplish the task, when in the presence of

a prosecutor and defense attorney. He later accomplished the task of pulling files and providing them to administration, while working on his own, which required less than forty (40) minutes of time;

18.     Plaintiff's work over the years with the testing process led him to conclude that, in rare cases, review of the entire batch could reveal evidence that would tend to cause an individual result to be suspect. Consequently, he concluded that review of the entire batch which showed no irregularities would enhance the validity of the individual results. He came to the opinion that disclosure of the entire batch by AZDPS in each criminal case in which the blood alcohol level was at issue, and was requested by defense counsel, is in the public interest because it could either confirm the validity of the test, or, in rare cases, reveal deficiencies in the result;

19.     As part of this exploration of obtaining more efficiency, in early 2016, Plaintiff began to preserve the batch results in a directory file in the system, taken directly from the instrument download at the conclusion of the test run. He came to the conclusion that it would be efficient to use this method to access the entire batch documentation at a later date, after the technical and clerical reviews were concluded, taking only a few minutes of time;

20.     In or around March, 2016, Plaintiff informed Defendants Tripoli and Morris of his work. Neither, at that time, informed him that this effort violated any SAB protocols or practices, and neither ordered him to stop saving the information on tests that Plaintiff ran;

21. Before May 23, 2016, the attorney representing the defendant in a case styled State v. Worthen requested production through discovery of the entire batch run of tests, one of which was his client's. Plaintiff had been the scientist who conducted a reanalysis of the blood sample;

22. The lawyer representing the defendant filed a motion to compel discovery, and subpoenaed Plaintiff to a hearing in Casa Grande held on May 23, 2016;

23. During that hearing, Plaintiff was questioned by defense counsel as well as by the case prosecutor. He testified truthfully and completely in response to questions from both prosecution and defense;

24. One aspect of testimony was Plaintiff's work in making the acquisition of entire batch runs more efficient. Plaintiff testified to his opinion that release of the entire batch would be in the public interest, and, except in rare instances, support the validity of the individual result;

25. Plaintiff heard nothing from the Defendants concerning this testimony until June 29, 2016. On that date, he was called into the office of Defendant Tripoli where he was confronted by both Tripoli and Morris regarding his testimony in State v. Worthen;

26. At conclusion of the meeting, Plaintiff was informed that he would no longer be allowed to conduct blood alcohol analysis, but would be limited to technical and administrative reviews. He was informed that any future testimony or interviews conducted with defense counsel would be monitored by the department to assure that his statements and testimony conformed to the demands of the department. He was directed as well to delete from the system all directory files which contained batch runs for the cases he had

done. These were the actions Defendants Tripoli, Morris and Figarelli had agreed upon in advance of Plaintiff being called in and reprimanded;

27. Following the meeting, Morris and Tripoli created a document titled "Performance Notation," a true and accurate copy of which is appended hereto as Exhibit A;

28. The document was never provided to Plaintiff for his review and acknowledgement;

29. One of the "corrective actions" Plaintiff was required to take was to "modify your testimony in such a way as to bring it inline (sic) with the position of the laboratory and the other analysts. Failure to do so will result in referral to PSU ["Professional Standards Unit"] for investigation.";

30. The next day, June 30, 2016, Plaintiff sought out Tripoli, to request a meeting with Defendant Chung regarding the preceding day's meeting. Tripoli engaged Plaintiff in conversation, then directed Plaintiff to go home and not return to the office until Tuesday, July 5, 2016;

31. Between the 30th and the 5th, Defendants conferred regarding Plaintiff's situation. It was agreed that action would be taken against Plaintiff because of his truthful testimony in the Worthen case; also because of the intent to prevent Plaintiff from truthfully and fully testifying in future cases; and because he was advocating internally that the department could without great difficulty change its practice to allow the production of batch runs if requested in a case;

32. When Plaintiff returned to work on July 5th, he was confronted by Tripoli, and presented with another "Performance Notation," a true and accurate copy of which is appended as Exhibit B;

33. When Plaintiff reviewed the document, which purported to describe his interactions with Tripoli on the 30th, he saw it was filled with inaccuracies and omissions. Plaintiff signed is acknowledgement of receiving the document, and noted that he was "unable to comply completely" with the directives that he would not testify as to his "personal opinions" and would change his future testimony to "bring it in alignment with the position of the laboratory and the other analysts.";

34. Two days later, on July 7th, Plaintiff was subpoenaed to give evidence in another evidentiary hearing, in the case of State v. Morel. As in the Worthen case, defense counsel had sought batch runs for tests done by Plaintiff, which had been denied by the department;

35. At the hearing, Plaintiff was questioned by defense counsel, and by the prosecutor, and testified truthfully and completely;

36. Present at the hearing was Defendants Morris and Tripoli;

37. Following the conclusion of Plaintiff's testimony, that day Morris spoke with Defendants Tripoli and Figarelli, and on July 8th, Figarelli prepared a complaint against Plaintiff for submission to PSU, charging him with having testified "in direct violation of verbal and written orders given to him." At the time, Figarelli knew Plaintiff had testified truthfully and accurately and that any investigation was unwarranted;

8

38. On July 8th, Figarelli, who had previously communicated the situation to Defendant Chung, took Plaintiff to Chung's office, where Chung handed Plaintiff a document notifying him of his being placed on indefinite administrative leave, upon accusations of insubordination, conduct adverse to the department and improper procedure;

39. Both Defendants knew at the time that the true reason behind the charges was because Plaintiff had testified truthfully and accurately at the previous day's hearing, and was therefore not going to abide by the directive that he "modify his testimony" for the administration;

40. Plaintiff was ordered that he was to remain at home during all working hours, and was required to get special permission to leave the home, permission being granted only for such necessities and doctors' appointments. Plaintiff was denied access to the department systems, and was given no assignments;

41. Beginning on July 20th, PSU began its investigation, assigned No. 2016-212. In the course of the investigation, Morris and Tripoli were interviewed and gave false and misleading information regarding their conduct and that of Plaintiff;

42. Upon conclusion of the investigation, the investigator prepared an "Investigation Narrative" which was forwarded to Defendants;

43. On or about November 4, 2016, Defendants met, conferred, and issued findings that Plaintiff was guilty of insubordination and conduct adverse to the Department;

44. Plaintiff was disciplined with a 16 hour suspension without pay;

9

45. Plaintiff was returned to work on or about November 4, 2016. Plaintiff was essentially stripped of all responsibilities, and had his work station changed so that he was sitting immediately outside Morris's office;

46. On or around November 16, 2016, Plaintiff learned that while he was on administrative leave, Morris had circulated to all Forensic Scientists in the laboratory a document identified as an Affidavit. By executing the affidavit, the affiant would swear that "Chromatograms from unrelated cases have no scientific value in a particular case." This language mirrors the directive that Plaintiff had been given on June 29th and again on July 5th;

47. On or about November 4, 2016, Plaintiff notified the department of his intent retire. He continued to come into work until approximately January 10, 2017. During that period, Plaintiff was assigned very limited duties, unrelated to his work as a Forensic Scientist;

### III.   FIRST CLAIM: FIRST AMENDMENT VIOLATION: RETALIATION

48. Plaintiff realleges Paragraphs 1 through 47 as if fully set forth herein;

49. This Claim is brought to vindicate rights guaranteed Plaintiff under the First and Fourteenth Amendments to the Constitution of the United States;

50. In testifying truthfully and completely under oath in the cases identified above, and in advocating within the SAB for a change in the manner in which the department responds to requests in criminal cases for entire batch runs, Plaintiff engaged in protected expression on matters of public concern;

51. None of Plaintiff's protected activities implicated actual or potential disruptions of the efficient operation of the SAB;

52. As of 2016, it was clearly established that state actors violated the First Amendment when they took retaliatory actions against a public employee for having given truthful testimony under oath, and advocated for change in internal agency practices which the public employee reasonably believed would further the interests of the agency;

53. Defendants retaliated against Plaintiff for having engaged in protected expression. Such retaliation included, but is not limited to: (1) ordering Plaintiff to alter his future testimony in order to comply with the administration's political interests; (2) ordering Plaintiff to cease any internal advocacy of change in the SAB practice and removing him from conducting testing; (3) sending Plaintiff home on June 30th after he notified Tripoli of his request to meet with Chung; (4) falsifying the July 5th Performance Notation and again directing Plaintiff to alter truthful testimony; (5) making out a complaint against Plaintiff, initiating an investigation of him by PSU, because Plaintiff violated Defendants' directives to alter his testimony to bring it in line with the administration's interests; (6) placing Plaintiff on indefinite administrative leave; (7) circulating the proposed Affidavit to all Forensic Scientists, including Plaintiff, which reinforced Defendants' previous directives to Plaintiff; (8) issuing Plaintiff discipline that Defendants knew was based on false and misleading information; (9) stripping Plaintiff of his job duties upon his return from administrative leave; (10) by these actions, constructively discharging Plaintiff from his employment with AZDPS;

54. These actions, individually and collectively, would chill a reasonable person from continuing to engage in protected expression;

55. As a direct and proximate result, Plaintiff suffered loss of income and benefits; humiliation, emotional distress and damage to reputation; and will suffer such injuries and losses in the future;

WHEREFORE, Plaintiff demands judgment of Defendants, jointly and severally, as follows:

1. An award of special damages in such amounts as the jury deems just;

2. An award of compensatory damages in such amount as the jury deems just;

3. An award of reasonable attorney fees and costs of this action, pursuant to 42 U.S.C. §1988;

4. Interest;

5. Such other relief as the Court deems just.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
9040 North Placita Verde
Tucson, Arizona 85704
Telephone: 888-318-0075
mike@mgmoorelaw.com

/s/ Joseph P. St. Louis
Michael Garth Moore (023742)
Nesci & St. Louis, P.L.L.C.
216 N. Main Avenue
Tucson, Arizona 85701
Telephone: 520-622-1222
joestlouis@.azdefense.com

Trial Counsel for Plaintiff

**<u>JURY DEMAND</u>**

Plaintiff demands trial by a jury of twelve (12) persons as to all issues.

/s/ Michael Garth Moore
/s/ Joseph P. St. Louis