**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Greg Ohlson,<br><br>    Plaintiff,<br><br>v.<br><br>Beth Brady-Morris, et al.,<br><br>    Defendants. | No. CV-18-01019-PHX-DLR<br><br>**ORDER** |

Before the Court is Defendants' amended motion for summary judgment, which is fully briefed. (Docs. 63, 69, 70.) For the following reasons, the Court will grant the motion.

**I. Background**

Plaintiff Greg Ohlson began employment as a forensic scientist in the Phoenix alcohol unit of the Scientific Analysis Bureau ("SAB"), a division within the Arizona Department of Public Safety ("DPS"), in 2015. (Doc. 63-1 at 11.) The alcohol unit analyzes blood samples, sent to the lab by law enforcement agencies, for alcohol concentration. Samples are placed in sealed vials and inserted into an instrument, which generates a chromatogram graph showing the components of each sample. Forensic scientists are responsible for the initial analysis of the blood alcohol data. As a part of this analysis, the forensic scientist runs and reviews all chromatograms in a batch.[1] (Doc. 63-

---

[1] A typical batch consists of samples from forty cases, along with calibrators and controls. (Doc. 63-4 at 2.)

4 at 2.) The data is subsequently reviewed by a technical reviewer and an administrative reviewer. (Doc. 63-3 at 25.) According to SAB policy, test results could only be disclosed after the three-step review has been completed. Further, SAB's quality assurance manual held that only the chromatograms for an individual case could be released. (Doc. 63-1 at 16.) Should a party wish to instead review the entire batch of chromatograms within which the singular chromatogram originated, they were required to do so in person at the crime lab or obtain a court order. (*Id.* at 44.) When test results are used as evidence in criminal prosecutions, forensic scientists performing the initial analysis give defense interviews and testify in court. (*Id.* at 4, 21.)

Plaintiff, who had previously worked for 11 years as a forensic scientist within the drug toxicology unit, was asked—based on his experience—to help the alcohol unit rewrite its analytical protocol and to provide input on improvements that could be made in the unit. (Doc. 63-1 at 13, 23.) Plaintiff also suggested operational changes to his supervisors, Joe Tripoli and Beth Brady, who asked him to put his suggestions in writing. (*Id.* at 43.) In response, Plaintiff sent a lengthy email on January 26, 2016, offering advice on "[a]reas to significantly improve the quality and reliability of [alcohol unit] services." (*Id.* at 150-51.) Among other suggestions, Plaintiff proposed that SAB release batch results online because Plaintiff did not agree with SAB procedure for releasing blood alcohol test results individually. Specifically, Plaintiff's work with the testing process led him to conclude that, in rare cases, review of the entire batch, as opposed to individual samples, could reveal evidence causing an individual result to be suspect. Notably, he believed that review of the batch run is "prudent to rule out possible instrument failure or other malfunction that might impact the overall result." (Doc. 69 at 10.)

Plaintiff began creating pdfs of the scanned batch data prior to the second and third reviews. And, in interviews with defense attorneys, he began suggesting that they request the results of cases in a batch. (*Id.* at 15-16.) SAB began to receive more requests from defense counsel to review batches in the lab. (*Id.* at 46.) On May 23, 2016, Plaintiff testified in *State v. Worthen* that receiving results in batches was helpful to determining the

validity of the analysis in the subject case and, although SAB policy did not allow for the release of results in batches, that he had created an emailable pdf of the batch results. (Doc. 63-4 at 5-16.) SAB Superintendent Vince Figarelli thereafter determined that Plaintiff should be permanently removed from initial analysis of cases, moving him instead to technical and administrative review. (Doc. 63-1 at 91, 99; Doc. 63-3 at 2-3.)

On June 29, 2016, Brady and Tripoli met with Plaintiff, reprimanding him and informing him of modified duties. (Doc. 63-1 at 153-54.) They explained that, as a result of his behavior,[2] his duties would be limited to technical and administrative reviews, his

---

[2] The performance notation from that meeting noted: "[Y]our testimony and interviews with the defense have been seen as actions inimical to the interests of the lab and the department. It has become apparent that you have been attempting to forward your own agenda with regards to how blood alcohol analysis is conducted and what material is disclosed." (Doc. 63-1 at 153.) The notation also stated,

1. ... [Y]our opinion regarding the necessity of evaluating all of the chromatograms from a run in order to determine if an individual sample is successful is contrary to the opinion of the other analysts in the bureau and contrary to the position of the laboratory.

2. ... [T]estifying about what other agencies in the state do with regards to disclosure or storage of their data is outside your current qualifications. . .

3. You have testified that you have a pdf file that could be easily attached to an email and disclosed. While you may have the chromatograms in a pdf file and the file could be attached to an email, doing so would violate SAB policies. Testifying or interviewing in this fashion is misleading and harmful to the department.

4. You state in your testimony in the *State v. Worthen* evidentiary hearing that DPS stores data in individual case files because it is "convenient when you don't want to actually bring up additional documents." The implication that DPS had ulterior motives for storing data in case files is inappropriate and damaging to the laboratory and the department.

5. During the *State v. Worthen* hearing you testified about what we could do to be able to provide the pdf file you have been creating prior to review. Unless you are specifically asked about how we could change things to make it easier, it is inappropriate for you to be making suggestions in your testimony or interviews about how we could change our process to make the disclosure easier. You should be testifying about how we currently operate not about what your ideas are for change. As [Tripoli] and I explained,

testimony and interviews would be monitored, he would be expected to modify his testimony to bring it in line with the position of the laboratory, he was to stop scanning data, and that any already scanned files should be deleted. (*Id.* at 154.) Plaintiff responded that he would not change his testimony. The next morning, Plaintiff sent an email to Tripoli requesting a meeting with the Assistant Director for the Technical Services Division, Timothy Chung. (*Id.* at 156.) Plaintiff entered work and expressed frustration to a fellow forensic scientist, Herlinda Graham, and told Tripoli had he had lost trust in the administration, who responded that Plaintiff should refrain from confronting other employees about his frustrations. (*Id.* at 158.) Tripoli, lab manager Brooke Arnone, and Figarelli chose to send Plaintiff home for the rest of the day. (*Id.*) Plaintiff returned to work on July 5, 2016 and met with Tripoli and Brady. At the meeting, Tripoli issued a performance notation ("the Warning") setting forth six expectations:

> 1. You will adhere to the Policies and Procedures set forth by DPS General Orders and SAB General Procedure Manual.
> 2. You remain on limited duties performing Technical and Administrative reviews of case work and other duties as assigned by your supervisor.
> **3. You will not use legal proceedings as a forum to advance personal agendas or personal opinions similar to those identified in the summary of incident.**
> 4. You are to cease the scanning of our data and any such files that exist are to be deleted.
> 5. From this day forward all testimony and defense interviews will be monitored and you are to notify your supervisor or designee of any upcoming testimonies or interviews.
> **6. You will modify your testimony is such a way as to bring it into alignment with the position of the laboratory and the other analysts.**

(Doc. 63-1 at 159) (emphasis added.) Plaintiff signed the Warning, writing above his

---

your ideas for change need to be made through the chain of command not in the courtroom or during an interview.

(Doc. 63-1 at 153-54.)

signature that he would be "unable to comply completely," adding an asterisk to expectations three and six. (*Id.*)

On July 7, 2016, Plaintiff testified at a hearing in *State v. Morel* concerning a defense request to release all the chromatograms from the batch that included the defendant's samples. (Doc. 63-4 at 18-36.) Plaintiff explained that it was not the department's policy to release batch reports, but that he had created a pdf of batch results, which his supervisors later made him delete. He also noted that review of the entire batch could possibly be relevant to determining whether the defendant's blood test results were accurate and reliable. (*Id.*) When prompted, he additionally confirmed that it was not in his best interest in terms of career advancement to testify as he had, and that he had been removed from casework by his superiors for so testifying, even though he did not believe he had violated department policy. (*Id.*)

Concerned that Plaintiff violated the Warning's directives, Figarelli filed a complaint with DPS' Professional Standards Unit ("PSU"), which placed Plaintiff on administrative leave while it investigated the complaint. While on administrative leave, Plaintiff was required to call in each day to Tripoli. (Doc. 63-1 at 83.) During one of these calls, Plaintiff expressed that he understood that the Warning required him to testify falsely in court and that Tripoli, Brady, and Figarelli had therefore engaged in witness tampering. (*Id.*) On September 9, 2016, Brady and Tripoli met with Plaintiff and gave him a memo advising him that numbers 3 and 6 of the performance notation directives were replaced with "[d]o not misstate DPS policies." (Doc. 63-2 at 2.) On November 2, 2016, the PSU served Plaintiff a notice that charged him with conduct adverse to the department and insubordination.[3] (Doc. 63-1 at 130-35.) On November 4, 2016, Plaintiff was suspended

---

[3] In support of the charges, the PSU cites evidence of Plaintiff's allegedly adverse and insubordinate conduct. Specifically, it accuses Plaintiff of "changing" his opinion about SAB protocol regarding chromatogram batch release, creating copies of chromatogram batches, "promot[ing] his personal agenda as it related to how blood alcohol analysis should be conducted," stating, "I have told them if I cannot change the system from inside, find ways to improve it, I will do it from outside," expressing "a desire to have the courtroom [on July 7, 2016] filled to capacity so [he] could inform every one of the things [he] felt were wrong with the Department, its leadership, and its policies and procedures," initially refusing to delete the scanned chromatogram data based on a belief that to do so would be to illegally destroy evidence, confirming in testimony that his

- 5 -

for 16 hours based on those charges. (*Id.* at 128, 137-39, 141.) After serving his suspension, Plaintiff returned to work. He was isolated from the blood alcohol and toxicology units, placed in a cubicle outside Brady's office, and given little work to do. (Doc. 69-2 at 22.) Plaintiff gave written notice of his retirement, effective January 2017. (*Id.* at 32.)

On April 2, 2018, Plaintiff filed suit in this Court. He brings a claim against Defendants pursuant to 42 U.S.C. § 1983 for retaliation in violation of the First Amendment.[4] On August 12, 2019, Defendants filed their amended motion for summary judgment, which is now ripe.

## II. Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id.* at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts[,]" and instead "come forward

---

testimony was contrary to his career advancement's interests, and disobeying department orders by notifying defense counsel of his removal from casework analysis based on a belief that he was legally obligated to do so. (Doc. 63-1 at 131-39.)

[4] Plaintiff has abandoned his conspiracy claim. (Doc. 69 at 3.)

with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted). Even where there are some factual issues raised, summary judgment is appropriate if the totality of the undisputed facts is such that reasonable minds could not differ on the resolution of the factual question. *Chesney v. United States*, 632 F. Supp. 867, 869 (D. Ariz. 1985).

**III. Discussion**

Section 1983 creates a cause of action against a person who, acting under color of state law, violates the constitutional rights of another person. The constitutional right at issue here is the freedom of speech protected by the First Amendment.

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 822 (9th Cir. 2017) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). Rather, the First Amendment protects a public employee's right in certain circumstances to speak as private citizens on matters of public concern. *Connick v. Myers*, 461 U.S. 138, 146-47 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Specifically, Plaintiff may establish a prima facie § 1983 case under the *Pickering* test by showing (1) he spoke on a matter of public concern, (2) he spoke as a private citizen, (3) his speech was a substantial or motivating factor in the adverse employment action that he suffered, (4) the state had an inadequate justification for treating him differently from other members of the general public, and (5) the state would not have taken the adverse employment action absent the speech. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011). Defendants argue that Plaintiff cannot satisfy the first two elements of the prima facie test. The Court will address these two elements in turn.

Turning to the first element, whether a subject constitutes a "matter of public concern" is an issue of law. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). The Ninth Circuit has adopted a "liberal construction of what an issue 'of public concern' is under the First Amendment[.]" *Desrochers v. City of San Bernadino*, 572 F.3d 703, 709-

10 (9th Cir. 2009). It is Plaintiff's burden to prove that his speech addressed an issue of public concern based on "the content, form, and context of a given statement, as revealed by the whole record[.]" *Connick*, 461 U.S. at 147-48. Here, Plaintiff spoke at SAB, in informal interviews, and in courtrooms to advocate for the release of batch runs to ensure SAB transparency, quick and efficient access to results, and increased test result accuracy and reliability.[5]

Speech regarding "the efficient performance of [government] duties" addresses a matter of public concern. *Allen v. Scribner*, 812 F. 2d 426, 431 (9th Cir. 1987); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103-04 (9th Cir 2011) (citations omitted) ("[S]peech that helps the public evaluate the performance of public agencies addresses a matter of public concern); *Connick*, 461 U.S. at 161 ("[O]ne of the central purposes of the First Amendment[] is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government."). Because Plaintiff's batch-release advocacy involved SAB's duty to serve the criminal justice system by improving the justice department's access to accurate test results, his speech was a on matter of public concern.

Next, turning to the second element, the inquiry in determining whether speech was made as a public employee or as a private citizen is a mixed question of fact and law. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). The Court must first make a factual determination as to the scope of a plaintiff's job responsibilities. Then, the Court must decide the constitutional significance of those facts as a matter of law. *Johnson*, 658 F.3d at 966. "[N]o single formulation of factors can encompass the full set of inquiries relevant to determining the scope of a plaintiff's job duties[,]" but the Ninth

---

[5] For the first time in response to Defendants' motion for summary judgment, Plaintiff advances new theories that his protected speech also included his advocacy to eradicate the perception of bias for the prosecution, whistleblowing that management was sweeping errors under the rug, and reports of witness tampering. These allegations are nowhere in the complaint, however. A complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (citing Fed.R.Civ.P. 8(a)(2)). Plaintiff failed to amend his complaint to include these theories and has not otherwise indicated that he provided adequate notice to Defendants. Consequently, Plaintiff may not now rely on these novel theories. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006).

Circuit has provided some non-exhaustive guiding principles. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013).

It is undisputed that Plaintiff's technical job responsibilities as a forensic scientist included providing expert testimony in court, providing technical advice and guidance to other forensic scientists, and researching and evaluating new methods of analysis to update scientific methodology. (Docs. 63-3 at 21; 63-1 at 10.) However, Plaintiff's supervisors specifically directed him to stop speaking in favor of batch-release and to "conform" his testimony with that of other analysts; when he disobeyed orders and nevertheless advocated for batch release, internally and externally, his supervisors subjected him to adverse treatment. "[W]hen a public employee speaks in direct contravention to his superior's orders, that speech may often fall outside the speaker's professional duties. Indeed, the fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties notwithstanding any suggestions to the contrary in the employee's formal job description." *Dahlia*, 735 F.3d at 1074-75 ("Even assuming *arguendo* that [the plaintiff] might normally be required to [perform certain speech] pursuant to his job duties, here [by performing the speech,] he defied, rather than followed, his supervisors' orders [and thus spoke as a private citizen.]"). Further, Plaintiff went outside the chain of command, speaking with attorneys privately about the importance of receiving results in a batch. *Id.* ("When a public employee communicates with individuals or entities outside his chain of command, it is unlikely that he is peaking pursuant to his duties.").

Finally, the Court is persuaded by other circuits' rationale that "[w]hen a public employee gives testimony pursuant to a subpoena, fulfilling the general obligation of every citizen to appear before a grand jury or at trial, he speaks as a citizen for First Amendment purposes." *Chrzanowski v. Bianchi*, 725 F.3d 734, 741 (7th Cir. 2013) (internal quotations and citations omitted); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1105 (9th Cir. 2011). In consideration of the foregoing, the Court concludes that when advocating for

batch release following his receipt of the Warning, specifically when testifying in *Morel*, Plaintiff spoke as a private citizen. Because Defendants do not contest that Plaintiff has met the other elements of the test, Plaintiff successfully makes a prima facie case under § 1983.

Next, Defendants raise the *Pickering* affirmative defense requiring the court "to balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (quoting *Pickering*, 391 U.S. at 568). Notably, "[t]here is considerable value . . . in encouraging, rather than inhibiting, speech by public employees [because] government employees are often in the best position to know what ails the agencies for which they work." *Lane v. Franks*, 573 U.S. 228, 236 (2014) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994)). And, "[u]nder some factual circumstances, [] the *Pickering* balancing test can favor protected speech even where the speech violates the employer's written policy requiring speech to occur through specified channels." *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017) (quoting *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009)). Relevant here, in asserting the defense the employer "must do more than show mere disruption. Instead, it must show actual injury to its *legitimate* interests." *Johnson v. Mutnomah Cty., Or.*, 48 F.3d 420, 427 (9th Cir. 1995) (allegations of interference with working relations and the plaintiff's relationship with co-workers, subordinates and private vendors insufficient to show injury to legitimate employer interests). Defendant fails to indicate how its legitimate interests suffered particularized injury as a result of Plaintiff's speech. Without more, Defendants' affirmative defense fails.

Nevertheless, Defendants are entitled to qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Defendants are not entitled to qualified immunity if (1) the facts adduced

show that the officer's conduct violated a constitutional right, and (2) that right was 'clearly established' at the time of the violation." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016). However, Plaintiff's First Amendment right was not clearly established at the time of the violation. Notably, because the *Pickering* test "requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will 'rarely, if ever, be sufficiently clearly established to preclude qualified immunity [.]" *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 979-80 (9th Cir. 1998). "The issue the court must decide therefore, is whether the outcome of the *Pickering* balance so clearly favored [Plaintiff] that it would have been patently unreasonable for [Defendants] to conclude that the First Amendment did not protect his speech." *Id.* at 980.

It would not have been patently unreasonable for Defendants to conclude that the First Amendment did not protect Plaintiff's speech. Plaintiff fails to produce caselaw indicating that "public employees—such as police officers, crime scene technicians, and laboratory analysts—[for whom] testifying is a routine and critical part of their employment duties" are nevertheless protected by the First Amendment when testifying in ways contrary to an employer's directives. *Lane v. Franks*, 573 U.S. 228, 247 (2014). Rather, the Supreme Court has explicitly noted that the issue has not been addressed. *Id.* The other cases cited by Plaintiff in support of a "clearly established" finding are only tangentially related to the facts at hand, which is problematic when the facts are determinative to a *Pickering* test result. Further, the Court's *Pickering* inquiry was difficult in this case, especially analyzing whether Plaintiff spoke as a private citizen or a public employee. The closeness of the question only underscores that Defendants, when faced with the same facts, could not have been clearly and unequivocally on notice that their behavior was violative. Accordingly,

//

//

//

**IT IS ORDERED** that Defendants' amended motion for summary judgment (Doc. 63) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Defendants and terminate the case.

Dated this 13th day of March, 2020.

Douglas L. Rayes
United States District Judge